E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0631
     Facsimile: (213) 894-0141
     E-mail:    Kathrynne.seiden@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 8:23-00100-CJC-1 |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT CHANCE BRANNON |
| v. | Hearing Date: April 15, 2024 |
| CHANCE BRANNON, TIBET ERGUL, and XAVIER BATTEN, | Hearing Time: 9:00 a.m. Location:    Courtroom of the              Hon. Cormac Carney |
| Defendants. | |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Kathrynne N. Seiden,

hereby files its Sentencing Position for Defendant Chance Brannon.

     This Sentencing Position is based upon the attached memorandum

of points and authorities, the files and records in this case, the

Declaration of Jennifer Hirsch submitted concurrently herewith, and

such further evidence and argument as the Court may permit.  The

government respectfully reserves the right to supplement this

Sentencing Position with additional information as needed, including
to respond to defendant's Sentencing Position.

Dated: April 1, 2024                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney

                                        CAMERON L. SCHROEDER
                                        Assistant United States Attorney
                                        Chief, National Security Division


                                              /s/
                                        _____
                                        KATHRYNNE N. SEIDEN
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

In March 2022, while enrolled as an active-duty U.S. Marine, defendant Chance Brannon ("defendant") firebombed a healthcare clinic in furtherance of his political views, deliberately hoping to scare civilians, clinic employees, and physicians.  But for law enforcement's intervention, that incident would have been the first in a line of domestic terrorism incidents intended to "send a message" to groups defendant hated.  Defendant's hatred knew no bounds, extending to women, racial and religious minorities, and the LGBTQ+ communities.  Thus, in the months leading up to his arrest in this case, defendant took steps towards planning additional attacks on a second healthcare clinic, Jewish residences, the Orange County power grid, and Dodgers Stadium on a night celebrating LGBTQ+ pride.  Defendant was arrested in June 2023, just days after discussing his imminent plans to commit some of those attacks.

In November 2023, defendant pled guilty to all counts of an indictment charging him with conspiracy, malicious destruction of property by fire and explosives, possession of an unregistered destructive device, and intentional damage to a health services facility, in violation of 18 U.S.C. §§ 844(n), 844(i), 248(a)(3), and 26 U.S.C. § 5861(d), all arising from the March 2022 firebombing.  (Dkts. 26, 55, 62.)  In March 2023, the United States Probation and Pretrial Services Office ("Probation") issued its Presentence Investigation Report ("PSR") and Recommendation Letter, in which it correctly calculated defendant's offense level as 21 and his criminal history category as I.  (Dkt. 89 (PSR) ¶ 156.)  Probation further determined that although defendant's guidelines range would

ordinarily be 37 to 46 months, given the mandatory statutory minimum sentence of 60 months' imprisonment, defendant's guidelines term is 60 months.  (Id.)  However, Probation noted that upward departures were warranted to account for charges not pursued as part of a plea agreement and to account for circumstances not adequately taken into account in determining the applicable guidelines range, for an adjusted offense level of 28 and a guidelines range of 78 to 97 months' imprisonment.  (PSR ¶¶ 171-175; Dkt. 88 ("Recommendation") at 9.)  Probation recommended that defendant be sentenced to a high-end sentence of 97 months' imprisonment, a three-year term of supervised release, $1,000 in restitution, and a $400 special assessment. (Recommendation at 1, 2.)  The government agrees with Probation's calculations and recommendation and requests that defendant be sentenced accordingly, with the exception of the mandatory special assessment.  Anything less than a high-end sentence would not adequately reflect the scope of defendant's conduct and would fall critically short of protecting the public.

## II.  STATEMENT OF FACTS

### A.  Defendant Attacks a Planned Parenthood to Scare Women and Intimidate Medical Professionals

Beginning around February 2022, defendant, then an active-duty Marine, conspired with his codefendants, Tibet Ergul ("Ergul") and Xavier Batten ("Batten"), to attack a commercial property.  (Dkt. 55 (Plea Agreement) ¶ 18.)  After considering other targets, defendant chose to target a Planned Parenthood.  (Id.)  As he admitted in his Plea Agreement and at his change of plea hearing, defendant hoped not only to make a statement against abortion, but also to scare pregnant women away from obtaining abortions, deter doctors, staff, and

employees of the clinic from providing abortions, intimidate the clinic's patients, and encourage others to engage in similar acts of protest.  (Id.)

On March 12, 2022, in Ergul's garage in Orange County, defendant and Ergul put together a Molotov cocktail, consulting with Batten via text message for instructions on how to do so.  (Id.) Around 1:00 a.m. on March 13, 2022, disguised in dark clothing, hoods, masks, and gloves, defendant drove himself and Ergul to the vicinity of a Planned Parenthood in Orange County.  (Id.)  Defendant and Ergul approached the entrance of the clinic, ignited the Molotov cocktail, and threw it at the clinic entrance, intentionally starting a fire.  (Id.)  Defendant and Ergul then fled.  (Id.)  Within minutes, defendant texted Batten to tell him their plan had been successful.  (Id.)  Specifically, defendant and Batten exchanged the following messages:

```
DEFENDANT:    It's done.
BATTEN:       88.[1]  Did you see how long it lasted?
DEFENDANT:    Not really but it was fucking good
BATTEN:       Just making sure it all went well.
              Congratulations on your success brother
DEFENDANT:    Thank you.  Please pray for our shelter from the
              investigative eyes
BATTEN:       I will.
```

(PSR ¶ 30.)

Around 3:00 a.m., defendant and Ergul returned to the Planned Parenthood to surveil their work.  (Id. ¶ 31.)  Defendant then dropped Ergul off at home and returned to his parents' home.  (Id.) Defendant, Ergul, and Batten successfully damaged the clinic, which

---

[1] "88" is a coded term for "Heil Hitler," often used by white supremacists and neo-nazis, based on H being the eighth letter of the alphabet.  As described below, defendant and his acquaintances often greeted each other using "88."  (Hirsch Decl. ¶ 2.)

was forced to close temporarily and to reschedule approximately 30 patients' appointments.  (Plea Agreement ¶ 18.)

### B. Defendant Plans to Attack a Second Planned Parenthood and Repeatedly Condones Rape and Violence Towards Women

In May 2022, two months after he and Ergul firebombed Planned Parenthood, defendant texted with another friend to celebrate the Supreme Court's leaked opinion overturning <u>Roe v. Wade</u>.  (PSR ¶ 34.) Defendant told the friend: "This is a glorious victory.  But now more than ever we must pray and act because women who were indecisive before may decide to get one before the Court rules / Hail Christ 88."  (<u>Id.</u>)  Defendant's words were more than just empty threats; the next month, after the Supreme Court released its decision, defendant and Ergul planned to use a second Molotov cocktail, which they kept in Ergul's garage, to damage or destroy a second Planned Parenthood clinic.  (Plea Agreement ¶ 18.)  Ultimately, defendant and Ergul abandoned their plan because they saw law enforcement near the clinic they planned to target.  (Id.)

Although he did not attack a second clinic, neither defendant's desire to address his political grievances through violence nor his animosity towards women subsided.  As just a few examples, in November 2022, in discussing an online post expressing support for women's reproductive rights, defendant wrote to Batten: "Cultivate rape of this individual . . . This person should be raped to death by donkeys / Reddit faggo bugman talk."  (PSR ¶ 52.)  In March 2023, defendant texted another friend: "There are so many annoying rape victim bitches that I have a hard time having sympathy for them / Because the way they act makes me think, 'you should be raped again.'"  (<u>Id.</u> ¶ 53.)  Defendant later added: "The Idaho killer is

4

already getting female fanmail which isn't surprising at all / Women are fucking disgusting." (Id.)

Defendant's violent overtures regarding women continued until just before his arrest.  In May 2023, a month before his arrest, defendant told a friend: "I seriously considered raping a woman today." (Id. ¶ 42.)   Defendant continued: "This bitch gave me lip in the parking lot and I had a flash of just pushing her over and raping her." (Id.)  Defendant then asked the friend if he was going to "stalk" a female soldier stationed nearby. (Hirsch Decl. ¶ 6 & Ex D at 223.)  When the friend wrote that he was going to "rape her to death," defendant responded: "Please do." (Id. at 231-32.)  Days later, the same friend asked defendant how he would "stop a bitch from stealing all [his] shit" without a prenuptial agreement. (PSR ¶ 53.)  Defendant wrote: "By killing her." (Id.)

When interviewed, defendant's fellow Marines confirmed that defendant would frequently make sexist and misogynistic jokes in the workplace. (Id. ¶ 146.)  One Marine recalled defendant making comments about killing women who had abortions, observing that defendant did not laugh when making those comments. (Id.)

## C. Defendant Advises His Codefendant on How to Get Away With Attacking a Clinic and Other Illegal Conduct

In May 2022, approximately two months after congratulating defendant on having successfully firebombed a clinic, Batten consulted defendant via text message about how he could "get away with" destroying another reproductive health services clinic. (Plea Agreement ¶ 18.)  Defendant obliged, advising Batten to use various protective measures to avoid detection, including putting his phone in airplane mode, planning "quick escape routes," avoiding being

identified on camera, and obscuring his face and skin color.  (Id.)
Defendant told Batten: "If you're gone immediately there's basically
zero chance of capture.  The local pd will be searching for a tall
man who's not even around anymore."  (PSR ¶ 33.)  Defendant then
instructed Batten: "Delete these messages after you write them down
or memorize them."  (Id.)

In September 2022, the FBI visited Batten because he was posting
guides on creating destructive devices on a gaming platform.  (Id.
¶ 36.)  After the FBI interviewed Batten, defendant texted him: "HEY
DUMBASS STOP TALKING TO THE FEDS."  (Id.)  Later, Batten told
defendant about the warnings FBI had given him about continuing to
disseminate the guides.  (Id.)  Defendant responded: "That's actual
horseshit you cannot be indicted on conspiracy unless it was someone
you knew / Like me."  (Id.)  Defendant then advised Batten that any
admissions would make it difficult to later disavow responsibility,
including by claiming that he had been hacked.  (Id.)  Defendant
advised Batten: "that's reasonable doubt, and reasonable doubt is an
acquittal."  (Id.)

**D.    Defendant Plans Additional Hate Crimes in Furtherance of
        His Extremist Ideologies**

     1.    <u>Defendant Plans Attacks on the Jewish Community in
        Furtherance of His Neo-Nazi Ideology</u>

Defendant's vitriol was not reserved for women; rather, his
communications reflect that defendant also subscribed to a neo-Nazi
ideology.  For example, Defendant frequently greeted his friends and
online associates with "88," coded language for "Heil Hitler."  (PSR
¶¶ 30, 34; Hirsch Decl. ¶ 2.)  At one point, defendant sent one
friend a video in which a man counts on his fingers while dubbed
audio states: "Massacre jews, destroy freemasons, burn protestants,

rape their women." (PSR ¶ 54.) Approximately six months before his arrest, defendant messaged the same friend that the "gay nigger feminization of America at the hands of the jews is almost complete." (Id.) Approximately three months before his arrest, defendant texted another friend: "You don't have to like every single decision Hitler made to see he was a great man who loved his people and tried to save us all from the jews." (Hirsch Decl. ¶ 6 & Ex. D at 66.) And approximately two months before his arrest, defendant texted another friend that "benching while listening to [National Socialist Black Metal] makes me want to get like a swastika tattoo." (PSR ¶ 54.)

Photographs recovered from defendant's and his associates' devices provide additional insight into defendant's antisemitic views. For example, a photograph on Ergul's phone shows defendant smiling with a Nazi swastika armband superimposed on his arm. (PSR ¶ 25 n. 2.) Another photograph recovered from Ergul's phone shows defendant, Ergul, and another associate standing in the "Heil Hitler" stance while a second associate kneels with a large rifle. (PSR ¶ 25 n. 2; Hirsch Decl. ¶ 3 & Ex. A.)



Materials found in defendant's home further reflect defendant's neo-nazi ideology.  Specifically, in his bedroom, defendant kept books espousing Jewish conspiracy theories and letters from his codefendant containing violent and antisemitic writings and drawings, including, for example, a drawing depicting a "Boy Marine" shooting an antisemitic portrayal of a Jewish person with the caption: "THANK YOU FOR KEEPING AMERICA PURE."  (Hirsch Decl. ¶ 4 & Ex. B.)



Defendant did not save his antisemitic views for his private consumption or closest confidantes.  Rather, defendant's fellow Marines noted that he would say things like: "All jews deserve to die;" "Jews control show business;" "Hitler didn't finish the job;" and Jews "manipulate the black community."  (PSR ¶ 146.)

Critically, defendant's antisemitism directly motivated his criminal proclivities.  For example, before attacking the Planned

Parenthood, defendant considered attacking the San Diego office of the Anti-Defamation League.[2]  (Plea Agreement ¶ 18.)

As another more recent example, just days before his arrest in this case, defendant texted with a friend about robbing a bank to "steal[] from the jews."  (PSR ¶ 44.)  Defendant opined that "a better way to rob jews would be [] home invasions in the hollywood hills," where "every other house would be a child sex dungeon." (Id.)  But what began as a seemingly theoretical discussion evolved into actual planning, as defendant named specific potential targets and discussed wanting to "post up outside the target house and surveil for like 2 weeks then plan it out, rehearse, and hit."  (Id.) Defendant then confirmed that he had friends, including Ergul, who would "be down," and offered that he could "find at least one other person . . . to wait outside with a radio on lookout."  (Id.) Defendant then instructed his friend to "research potential targets" and to "take leave to California" so they could carry out the attack. (Id.)  Fortunately, defendant was arrested three days later.  (Id.)

> 2. <u>Defendant Plans an Attack on the Power Grid to Start a Race War</u>

Defendant's violent extremism was also fueled by intense racism, which he expressed freely to his codefendants.  For example, in a conversation with Batten in February 2022, defendant questioned whether it would be okay in the eyes of the Church to "kill niggas who are malicious."  (PSR ¶ 51.)  January 2023, defendant texted Batten: "How far are you from hollywood florida . . . I need you to

---

[2] The Anti-Defamation League is a non-governmental organization and advocacy group founded with the mission to "stop the defamation of the Jewish people, and to secure justice and fair treatment to all."  (See adl.org/about/mission-and-history (last accessed April 1, 2024).)

drive there and lynch a nigger and his two children named [W.M.]." (Hirsch Decl. ¶ 5 & Ex. C at 133-34.)  Two months later, defendant asked Batten if it was "a sin to steal what has already been stolen / i.e. to steal from criminals" and then stated: "Steal from niggers and then kill them."  (Id. at 147-48.)

Defendant espoused his racist views to other acquaintances, as well.  For example, in March 2023, defendant wrote to another friend: "Just watched the body of lies scene where they throw the nigger out of the airplane and laughed my ass off." (Hirsch Decl. ¶ 6 & Ex. D at 1-2.)  In another conversation with that same person, defendant wrote: "The western US was always mostly Mexican ethnically which is why it needs to be cleansed of them." (Id. at 142.)  When the friend told defendant he saw "0 niggers and Mexicans" at his church, defendant wrote: "God is in control.  1488." (Id. at 150.)

Defendant's racism extended beyond his text messages with friends.  Defendant's fellow Marines noted that he made hateful comments towards all non-white individuals, including Jewish, Hispanic, African American, and Muslim acquaintances, including, for example, openly using a racial slur to refer to one fellow Marine's spouse.  (PSR ¶ 46.)  And just a few months before his arrest, in the Notes application of his phone, defendant wrote himself a note that read:

> Kill niggers.  Behead niggers.  Roundhouse kick a nigger into
> the concrete.  Slam dunk a nigger baby into the trashcan.
> Crucify filthy blacks.  Defecate in a niggers food.  Launch
> niggers into the sun.  Stir fry niggers in a wok.  Toss niggers
> into active volcanoes.  Urinate into a niggers gas tank.  Judo
> throw niggers into a wood chipper.  Twist niggers heads off.
> Report niggers to the IRS.  Karate chop niggers in half.  Curb
> stomp pregnant black niggers.  Trap niggers in quicksand.  Crush
> niggers in the trash compactor.  Liquefy niggers in a vat of
> acid.  Eat niggers. Dissect niggers.  Exterminate niggers in the

gas chamber.  Stomp nigger skulls with steel toed boots.
Cremate niggers in the oven.  Lobotomize niggers.  Mandatory
abortions for niggers.  Grind nigger fetuses in the garbage
disposal.  Drown niggers in fried chicken grease.  Vaporize
niggers with a ray gun.  Kick old niggers down the stairs.  Fed
niggers to alligators.  Slice niggers with a katana.

(PSR ¶55.)

Defendant sought to channel his white supremacist ideology into criminal conduct.  Beginning sometime in 2022 and continuing through approximately the time of their arrest, defendant and Ergul discussed starting a race war by attacking an electrical substation with the goal of damaging the substation and disrupting the functioning of the power grid in Orange County.  (Plea Agreement ¶ 18.)  As he later explained to a friend during a conversation about how to effectively commit "domestic terrorism," defendant noted: "we need to create food insecurity."  (PSR ¶ 38.)  On a thumb drive disguised as a military-style dog tag necklace bearing "Semper Fidelis," the motto for the U.S. Marines, defendant kept a .txt file titled: "Delete after reading."  (Plea Agreement ¶ 18.)  The file contained an operation plan and gear list for targeting a Southern California Edison substation.  Defendant possessed several of the items on the gear list, including but not limited to a Zastava ZPap M70 rifle with a handwritten Cyrillic message on the folding stock which roughly translates to "Total Nigger Death."  (Id.)  The thumb drive also contained recordings of the 2019 Christchurch Mosque shooting, a mass shooting in which a white supremacist, using firearms bearing white supremacist writings similar to that on defendant's firearm, murdered 51 people and injured 40 others.  (Id.)

11

3.   **Defendant Plans an Attack on Dodger Stadium on a Night Celebrating LGBTQ+ Pride**

Defendant's communications with others reflect a pattern of using homophobic slurs.  As just one example, in messages with a friend, defendant wrote: "The jews have to fag up everything including the last white sport / It's not enough to tolerate faggotry you must endorse it."  (Hirsch Decl. ¶ 6 & Ex. D at 95.)  As another, defendant texted another friend months before his arrest, complaining that the "gay nigger feminization of America at the hands of the jews is almost complete."  (PSR ¶ 54.)  In furtherance of his intolerance, in early summer 2023, defendant and Ergul discussed and researched how to attack the parking lot or electrical room of Dodger Stadium on a night celebrating LGBTQ+ pride, including by using a remote-detonated device.  (Plea Agreement ¶ 18.)  As part of their conversations about the attack, defendant shared with Ergul a "WW2 sabotage manual" and discussed doing "dry runs" to "case" the stadium.  (Id.)  Defendant also conducted research on Unabomber Ted Kaczynski, an infamous domestic terrorist who killed multiple Americans and injured many more during his campaign of terror.  (Id.)  As defendant explained to Ergul in discussing their plans, defendant wanted to "send a message" and noted "God will not be mocked."  (PSR ¶ 46.)  Defendant reassured Ergul: "Our desire to fight is a gift as long as we use it right.  God makes men warlike for a reason."  (Id.)

Defendant and Ergul were arrested two days before Pride Night.  (Id. ¶ 47.)

**E.   Defendant's Violent Proclivities Escalate Just Before His Arrest**

Concerningly, leading up to defendant's arrest, his apparent inclination towards violence seems to have escalated.  That

escalation is reflected not only in defendant's plans to rob a Jewish neighborhood and attack Dodger stadium, both expressed within days of his arrest, but also in his communications with friends in the preceding months.  For example, in March 2023, defendant texted a friend that he had a "long night" and was feeling "like murdering some niggas in particular."  (PSR ¶ 41.)  Days later, defendant told the same friend: "women want you to cut their heads off / expeditiously."  (Id.)  A week after that, in discussing U.S. Congresswoman Gabrielle Giffords, defendant opined that "Politicians should be killed with knives so they can't use it as an excuse for gun control."  (Id.)

At the end of March, defendant told the same friend he had "though about infiltrating the local [Socialist Rifle Association] and assembling target dossiers on the members," but got "lazy." (Id.) He then wrote: "I need to get back into domestic terrorism."  (Id.) Days later, in texting about a grievance related to his job, defendant wrote: "I think I'm going to kill a congressman over this." (Id.)  Defendant later reiterated: "Dude if something seriously bad happens to me because of this i'm just gonna start assassinating niggas."  (Id.)

In May 2023, defendant texted his friend a meme that read "I HATE NIGGERS" and wrote: "Why are the writers on strike also I just realized they're in LA I can go kill them with my car."  (Id. ¶ 42.) Ten days before his arrest, defendant texted the same friend: "it takes incredible restraint for me not to take my suppressed rifle and go kill specific people in LA."  (Id.)

On June 1, 2023, less than two weeks before his arrest, defendant texted: "Can we just be done with elections and have the

13

race war already." (Id.)  Days before his arrest, he lamented: "I really don't know if a race war is coming, man.  People will never do anything if everyone keeps waiting for it to start on its own." (Id.)

### F. Defendant is Arrested Possessing Multiple Illegal Firearms

When defendant was arrested in June 2023, law enforcement located numerous illegal firearms in his house, including multiple firearm silencers and an unmarked short-barreled rifle without a serial number, none of which defendant had registered.  (Plea Agreement ¶ 18.)  Defendant also possessed various California-noncompliant firearms, including a handgun with a threaded barrel, a handgun with an un-serialized lower receiver and a threaded barrel, and the semi-automatic rifle mentioned above.  (PSR ¶ 48.)

### III. UPWARD DEPARTURES ARE WARRANTED TO REFLECT ADDITIONAL FACTS NOT FACTORED INTO DEFENDANT'S GUIDELINES RANGE

As set forth in the Plea Agreement, the parties agree that defendant's base offense level is 24 under U.S.S.G. § 2K1.4.  (Plea Agreement ¶ 20.)  The government further agrees that pursuant to U.S.S.G. § 3E1.1, defendant is entitled to a three-level reduction for acceptance of responsibility.  (PSR ¶¶ 80-81.)  However, the government respectfully asks the Court to apply two upward departures to reflect facts not taken into account in determining defendant's guidelines range.

### A. A Five-Level Upward Departure is Warranted Under U.S.S.G. § 5K2.0(a)(2)(A) to Account For Defendant's Attempt to Intimidate and Scare Civilians

Under U.S.S.G. § 5K2.0(a)(2)(A), a court may depart from the otherwise applicable guideline range if there are circumstances that were not adequately taken into consideration in determining that

14

range.  Here, the applicable Guideline, U.S.S.G. § 2K1.4, accounts for defendant's conduct in throwing a Molotov cocktail at a place of public use.  But the Guideline does not take into account the pernicious motive for defendant's conduct, which was to commit, as he described it, "domestic terrorism" and intimidate civilians by making a violent political statement.  Rather, defendant's guidelines range would be the same if he were merely acting on a juvenile whim.

Notably, were the court to apply the terrorism enhancement under U.S.S.G. § 3A1.4, defendant's offense level would rise to level 32 and his criminal history would increase to category VI, for a guidelines range of 210 to 262 months' imprisonment.  That enhancement applies where a defendant commits a felony that involves or is intended to promote a "federal crime of terrorism," which includes arson that is "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct."  See U.S.S.G. § 3A1.4; 18 U.S.C. § 2332b(g)(5).  Obviously, defendant firebombed a Planned Parenthood just three months before the Supreme Court was set to issue a landmark ruling about abortion; thus, one could certainly question whether defendant's conduct was calculated to influence or affect government conduct, as would warrant application of the terrorism enhancement.  Nonetheless, the government is not seeking the terrorism enhancement, instead taking defendant at his word that his motive was to intimidate civilians.

However, Comment 4 to U.S.S.G. § 3A1.4 provides that "an upward departure [is] warranted" in a situation where "the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)," including arson under 18

U.S.C. § 844(i), "but the terrorist motive was to intimidate or coerce a civilian population."  That is precisely what transpired here.  As defendant admitted in his plea agreement and at his change of plea, he targeted Planned Parenthood because he wanted to "make a statement against abortion, scare pregnant women away from obtaining abortions, deter doctors, staff, and employees of the clinic from providing abortions, intimidate and interfere with patients of the clinic, and encourage others to engage in similar acts."  (Plea Agreement ¶ 18.)

Because defendant's offense conduct is not adequately captured by the applicable guideline and a distinct provision of the guidelines specifically contemplate that the circumstances present here warrant an upward departure, the government respectfully submits that a conservative, five-level upward departure is warranted.  See United States v. Tankersley, 537 F.3d 1100, 1116-17 (9th Cir. 2008) (affirming application of 12-level upward departure under § 3A1.4, cmt. 4 and § 5K2.0 where a defendant who committed arson and conspired to damage an energy facility intended to influence the conduct of a private entity, rather than the government, and thus fell short of qualifying for the full terrorism enhancement under § 3A1.4).

### B.   A Two-Level Upward Departure is Warranted Under U.S.S.G. § 5K2.21 to Account For Uncharged Conduct

While an upward departure is warranted under U.S.S.G. § 5K2.0(a)(2)(A) to account for defendant's insidious motive, an additional upward departure is warranted under U.S.S.G. § 5K2.21 to account for uncharged conduct.  Specifically, U.S.S.G. § 5K2.21 contemplates that an upward departure is warranted to reflect the

16

actual seriousness of an offense based on conduct underlying a potential charge not pursued in the case as part of a plea agreement. Here, as part of the plea agreement, the government agreed not to pursue additional charges, most notably for the silencer, short-barreled rifle, and second Molotov cocktail defendant possessed, all in violation of 26 U.S.C. § 5861. (Plea Agreement ¶ 3.)  The government therefore submits that a two-level upward departure is warranted to reflect the collection of illegal firearms which are otherwise unrepresented in defendant's guidelines calculations.

Factoring in a five-level upward departure under U.S.S.G. § 5K2.0 and a two-level upward departure under U.S.S.G. § 5K2.21, defendant's new offense level would be 28, for a guidelines range of 78 to 97 months' imprisonment.

## IV.  A 97-MONTH SENTENCE IS NO GREATER THAN NECESSARY TO ACCOUNT FOR THE RELEVANT FACTORS UNDER 18 U.S.C. § 3553(A)

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a 97-month sentence.  Even in a vacuum, defendant's crime -- building a homemade incendiary device and throwing it at the entrance of a building -- would have been egregious.  But defendant did far more than throw an incendiary device at a building; he targeted a healthcare clinic providing medical appointments, procedures, and counseling services, including to vulnerable patients.  Even more disturbing, defendant was far from apathetic to the impact his conduct might have on his victims.  To the contrary, defendant intentionally sought to terrorize them through his conduct, deliberately interfering with and intimidating healthcare professionals and their staff and intentionally scaring women seeking medical treatment and counseling.

1    Defendant's conduct was also far from a one-off act of

2    recklessness; rather, defendant admitted that he not only wanted to

3    encourage others to engage in similar conduct, but also sought to

4    repeat his conduct by attacking a second Planned Parenthood shortly

5    after the Supreme Court issued its decision overturning Roe v. Wade.

6    (Plea Agreement ¶ 18.)  In defendant's own parlance, he wanted to

7    "act" to prevent women "who were indecisive" from rushing to obtain

8    abortions.  (PSR ¶ 34.)  Put differently, rather than allow the

9    judicial and legislative systems to unfold, defendant took matters

10   into his own hands, weaponizing fear and intimidation to achieve his

11   political ends.

12        Perhaps most egregiously, at the time of his crimes, defendant

13   was an active-duty Marine who had taken an oath to protect the

14   national security of the United States.  Defendant not only shirked

15   that duty, but actively counteracted it by deliberately subjecting

16   civilians to violent acts of terror.  In short, defendant had

17   available to him various legal avenues to effectuate his political

18   views, including freely exercising his First Amendment rights and

19   engaging in the political process.  Instead, defendant chose domestic

20   terrorism, masquerading his violent extremism as religious

21   commitment.  The government respectfully submits that a high-end

22   sentence is warranted.

23   **B.   Defendant's History and Characteristics**

24        Defendant's history and characteristics also warrant a high-end

25   sentence.  Defendant espoused an indescribable level of vitriol for

26   various minority groups, seemingly sparing no one.  Defendant's

27   cavalier use of racial and homophobic slurs, casual expressions of

28   misogyny, and persistent expressions of violent intent went far

beyond empty words; rather, defendant intended -- and in many instances planned -- to take overt action that would at the very least scare and intimidate women, racial minorities, and the Jewish and LGBTQ+ communities, and would at worst harm or even kill real victims.

Moreover, defendant's guidelines calculations do not account for any of defendant's plans outside of the March 2022 firebombing, including his plans to firebomb a second Planned Parenthood, attack Dodger Stadium, rob Jewish homes, or instigate a race war by attacking the power grid.  By applying the requested upward departures, the Court can account for defendant's possession of illegal firearms and his insidious motive for attacking Planned Parenthood.  But defendant's sentence should also reflect his recent history of plotting repeatedly against the United States and its citizens, particularly while enlisted as a U.S. Marine.  Only a high-end, 97-month sentence is sufficient to account for defendant's characteristics and the entirety of his recent history.

Moreover, while a defendant's military service may be mitigating in some instances, here it is not.  The evidence reflects that defendant actively sabotaged the institution he was charged with serving, both by infecting the atmosphere with intolerance and hostility and by actively interfering with its missions.  Specifically, defendant's colleagues and supervisors described him as "lazy," "aloof," and "disinterested in working the mission," routinely turning in work that was "sloppy or incomplete."  (PSR ¶ 145.)  Ten days before defendant's arrest, he confessed to a friend: "During the last year of my contract I was on the verge of like actively sabotaging operations as much as possible."  (Id.

¶ 45.)  Defendants' colleagues consistently described him as someone who exhibited a lack of respect and made misogynistic, antisemitic, and hateful comments towards all non-white individuals, including using racial slurs to refer to one colleague's spouse and friends and insisting that "all Jews deserve to die," as do many women.  (Id. ¶ 46.)  And, of extreme concern, in 2022 defendant placed calls to not one, but two foreign adversaries, hoping to offer himself up as a "mole" by providing U.S. intelligence.  (Id. ¶ 37.)

In sum, defendant is an intelligent person who grew up with more resources and comforts than most.  To use Probation's words, defendant has "superior intelligence" and was afforded "a privileged upbringing," setting him apart from many defendants who appear before this Court.  (Recommendation at 10.)  But rather than put his opportunities and skills to good use, defendant focused his energy on nefarious, violent methods of perpetuating his white supremacist ideology, excusing his own behavior by insisting that "God makes men warlike for a reason."  (PSR ¶ 46.)  A high-end sentence is warranted to account for his history and characteristics.

**C.   The Need to Protect the Public and Promote Respect for the Law**

Critically, a 97-month sentence is necessary to protect the public from defendant's apparent insistence on perpetrating violent acts in furtherance of his deeply held beliefs.  Though difficult to capture the pervasiveness of those beliefs within the confines of this sentencing position, defendant's digital communications, conduct at work, and, most importantly, repeated willingness to act on those beliefs reflects that they are extreme and persistent.  Moreover, as detailed above, in the months leading up to defendant's arrest, his

violent proclivities seemingly escalated, as defendant expressed a desire to kill or rape seemingly anyone in his path and studied other notorious figures who committed acts of extreme violence.  The government sincerely hopes that defendant will be rehabilitated in custody, but that risk should not be borne by the public.  A high-end sentence is necessary to protect the public from defendant acting in furtherance of his violent aims.

Moreover, a high-end sentence is warranted to promote respect for the law, which defendant appears to lack entirely.  Though well versed in criminal law and operation security, (see e.g. PSR ¶¶ 36, 39, 44), defendant has used those skills to evade law enforcement and to counsel others in doing so.  (Id. ¶¶ 33, 36.)  That defendant willingly engaged in multiple plots or acts of domestic terrorism while enlisted as a U.S. Marine further suggests that defendant lacks any respect whatsoever for this nation, its laws, or its security.  A high-end sentence is warranted.

//

//

//

//

//

//

//

//

//

//

//

**V.    CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 97 months' imprisonment, a three-year term of supervised release, $1,000 in restitution, and a $325[3] special assessment.


 Dated: April 1, 2024                Respectfully submitted,

                                      E. MARTIN ESTRADA
                                      United States Attorney

                                      CAMERON L. SCHROEDER
                                      Assistant United States Attorney
                                      Chief, National Security Division


                                             /s/
                                    ————————————————————
                                    KATHRYNNE N. SEIDEN
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

---

    [3] Although Probation recommended a $400 special assessment, (PSR ¶ 165), one of the counts to which defendant pled guilty is a Class A misdemeanor, and thus warrants a $25 special assessment. <u>See</u> 18 U.S.C. § 3013(a)(1)(A)(iii).